IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| LEVIE ROBERTS, | ) |
|     Petitioner, | ) |
| v. | )    Case No. 2:22-cv-02479-SHL-atc |
| MIKE PARRIS, | ) |
|     Respondent. | ) |

**ORDER DIRECTING CLERK TO MODIFY DOCKET, DENYING PETITION PURSUANT TO 28 U.S.C. § 2254, DENYING A CERTIFICATE OF APPEALABILITY, CERTIFYING THAT AN APPEAL WOULD NOT BE TAKEN IN GOOD FAITH, AND DENYING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL**

Before the Court is the *pro se* Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody ("§ 2254 Petition") filed on July 21, 2022, in the United States District Court for the Eastern District of Tennessee by Petitioner Levie Roberts, an inmate at the Morgan County Correctional Complex ("MCCX") in Wartburg, Tennessee. (ECF No. 1.) On July 26, 2022, the court transferred the case to the United States District Court for the Western District of Tennessee. (ECF No. 8.) The MCCX Warden[1] filed Respondent's Answer to Petition for A Writ of Habeas Corpus on November 1, 2022. (ECF No. 18.) For the reasons stated below, the Court **DENIES** the § 2254 Petition.

I.    **BACKGROUND**

    A.    **State Court Procedural History**

---

[1] Shawn Phillips is currently the MCCX Warden. *See* Tennessee Department of Correction, Morgan County Correctional Complex (last accessed Apr. 21, 2025). The Clerk is **DIRECTED** to modify the docket to terminate all references to Mike Parris and to add Shawn Phillips as the Respondent. *See* Fed. R. Civ. P. 25(d).

On November 26, 2013, a grand jury in Shelby County, Tennessee, returned an indictment charging Roberts with the second-degree murder of David Williams. (ECF No. 17-1 at PageID 34–35.) A jury trial began in the Shelby County Criminal Court on August 8, 2016. (*See* ECF No. 17-6 at PageID 536–37.) William Massey and Joseph McClusky represented Roberts at trial. (*See id.* at PageID 536.) On August 12, 2016, the jury returned a guilty verdict. (ECF No. 17-8 at PageID 1019; *see* ECF No. 17-1 at PageID 81.) On January 12, 2017, the trial court sentenced Roberts to twenty years in prison. (*See id*. at PageID 82–88, 91.)

Roberts filed a notice of appeal. (*Id.* at PageID 96.) On July 14, 2017, Roberts' appellate counsel, Barry Kuhn, filed a Motion to Dismiss Appeal saying that "[a]fter several discussions with appellate counsel, the appellant advised counsel on June 15, 2017 that he wished to waive his right to appeal to the Court of Criminal Appeals." (ECF No. 17-11 at PageID 1095.) Kuhn said he discussed with Roberts the issues that would be raised and presented on appeal. (*Id.* at PageID 1096.) Kuhn had advised Roberts that an order dismissing the appeal would be final and that Roberts would have one year from the date of the order to file a post-conviction petition alleging ineffective assistance of counsel. (*Id.*)

On July 26, 2017, the Tennessee Court of Criminal Appeals ("TCCA") granted the Motion to Dismiss Appeal. (ECF No. 17-12.) The TCCA noted that, pursuant to Rule 11 of the Rules of the Court of Criminal Appeals, Kuhn had included a signed statement from Roberts that he understood his rights. (*Id.* at PageID 1100; *see* Affidavit in Support of Motion to Dismiss Appeal, ECF No. 17-11 at PageID 1098–99.)

On November 1, 2017, Petitioner filed a *pro se* Petition For Post-Conviction Relief. (ECF No. 17-13 at PageID 1114–42.) On June 19, 2018, Roberts, through appointed counsel J. Shae Atkinson, filed an Amended Petition for Post-Conviction Relief in the Shelby County

2

Criminal Court. (*Id.* at PageID 1145–51.) A post-conviction hearing was held over two days. (*See* ECF Nos. 17-15 and 17-16.) On November 22, 2019, the post-conviction court entered an order denying post-conviction relief, finding that Roberts was not prejudiced. (ECF No. 17-13 at PageID 1154–61.)

On post-conviction appeal, Roberts asserted that his trial counsel was ineffective for: (1) not noticing that the State's key witness gave prior inconsistent statements; and (2) failing to recall the State's key witness after the trial court gave the defense an opportunity to correct the mistake. (ECF No. 17-18 at PageID 1300.) The TCCA affirmed. *See Roberts v. State*, No. W2019-02165-CCA-R3-PC, 2021 WL 5495828, at *1 (Tenn. Crim. App. Nov. 23, 2021). (ECF No. 17-20). On March 28, 2022, the Tennessee Supreme Court denied permission to appeal. (ECF No. 17-23.)

### B.     Evidence at Trial

At about 10:00 p.m. on April 14, 2013, Williams, the victim, left his home on Philwood Avenue, where he lived with his father and stepmother, and drove to a gas station on Summer Avenue to buy a newspaper. *Roberts*, 2021 WL 5495828, at *1. Williams got into a brief verbal altercation at the gas station with Roberts, Demarcus Allen, and Steven Weathersby. *Id.* Roberts was driving a white Mercury Grand Marquis. *Id.* The men went into the store, and Williams purchased his newspaper and left. *Id.* When Roberts, Allen, and Weathersby came out of the store, they saw that the Mercury had been damaged and believed that the victim had intentionally run into the car. *Id.* The three men asked the store manager where the victim lived and to see the store's surveillance video. *Id.* The manager refused and told the men to call the police. *Id.*

Instead, the three men drove around the neighborhood looking for Williams' red Ford Focus. *Id.* They found the car in front of his house and vandalized it. *Id.* Williams' father, a retired Memphis Police Department ("MPD") detective, heard glass breaking, saw the men "messing" with the Focus, and alerted his son. *Id.* While Williams ran outside, his father got a pistol out of bedroom and went outside with the pistol in the pocket of his bathrobe. *Id.* He saw the Mercury speed away, but he did not see his son. *Id.* Williams' father went to the street and saw his son lying on the pavement in a pool of blood, his legs apparently broken. *Id.*

Dr. Anna Winter Slagle, a medical resident who lived across the street from Williams, tended to him. *Id.* at *1–2. Slagle testified that she heard loud banging noises, looked out her living room window, and saw a white car "sitting in the middle of the street." *Id.* at *2. Slagle saw Williams run from his house waving his hands before he "planted himself in front of the car with his hands up in the air." *Id.* Williams was standing several feet in front of the car, but did not touch it. *Id.* The car "went from pretty much 0 to 60," according to Slagle. *Id.* Slagle "did not notice 'any hesitation' from the car before it accelerated." *Id.* The car ran over Williams and sped away. *Id.*

Slagle testified that blood was coming out of Williams' right ear and that her "doctor instinct" kicked in, so she checked the victim's pulse. *Id.* He had a pulse and was breathing, but was unresponsive. *Id.* Slagle looked for a weapon, but she did not find one. *Id.* She then called 911. *Id.*

Roberts' counsel asked to recall Slagle to ask an omitted question. *Id.* Counsel noted that Slagle's primary statement, given to an "Officer Craig," was similar to her testimony. *Id.* However, there was another statement given to a different officer, Sergeant Kent, that "we didn't really see until right after [Slagle] testified" that said Slagle saw "a white four-door vehicle

4

speeding down the street with a male white running next to it on the passenger's side." *Id.* Slagle told Kent that the man "ran out in the street in front of the car and raised his hands but the car kept going." *Id.* Counsel said this statement shows that the car was speeding and Williams moved in front of the car. *Id.* After some questioning, the trial court said that Roberts' counsel could call Slagle as a defense witness. *Id.* at *3. (*See* ECF No. 17-6 at PageID 631–36.)

Allen, who was in the car with Roberts, testified for the State. *Id.* He said that Weathersby broke the rear window on the driver's side of the Focus, and that someone came to the door of Williams' house. *Id.* Allen said that he, Weathersby, and Roberts got into the Mercury, and Roberts "crunk the car up," pushed the gas pedal, and the car moved forward slowly. *Id.* Allen said that Williams ran outside, was hitting the passenger-side window of the Mercury, and then "jumped in front of the car." *Id.* Allen testified that someone said that Williams had a gun and that Williams reached for something on his hip. *Id.* Allen said that the three men in the Mercury "started ducking" down, and the Mercury "finally caught up with the accelerator," sped up, and ran over Williams. *Id.* Allen felt a "bump," and he opened the car's door and looked back at Williams, who was "moving, getting up." *Id.*

Weathersby also testified for the State. *Id.* He said that he and Allen were vandalizing Williams' car, and Williams ran outside. *Id.* Weathersby saw a "white lady" at the bus who yelled that Williams had a gun. *Id.* According to Weathersby, the three men got into the Mercury, and "everybody just put their head down." Roberts "threw the car in drive and we just pulled off." *Id.* Weathersby said he saw a black pistol in Williams' hand. *Id.* The Mercury picked up speed, and Weathersby "heard a bump." *Id.*

Weathersby acknowledged that he told police that Williams ran in front of the Mercury, that Williams put his hand on the car's hood like he was trying to stop the car, and that Roberts

5

"put the car in drive and sped off and ran over" Williams.  *Id.*  Weathersby said that Roberts' "old" Mercury was slow to accelerate and "[y]ou got to be pushing it . . . for it to pick up speed." *Id.*

Weathersby's "audio-recorded statement to a defense investigator" was played for the jury.  *Id.* at *3.  In the statement, Weathersby said, "[o]nce we back into [Roberts'] car, I screamed out that [the victim] had a gun because he was running out the door with a gun in his hand, which I seen was a gun." *Id.* at *4.  Everyone in the car ducked down to avoid getting shot, and Roberts put the car in drive, while his head was ducked down, and just hit the gas.  *Id.*

MPD Sergeant Robert Wilkie testified that, on April 17, 2013, Roberts waived his rights and gave a statement.  *Id.*  In this statement, Roberts said Williams came outside with a gun, a brown "wooded rifle," in his hand and approached the Mercury.  *Id.*  Roberts ducked down because he thought Williams was going to shoot and "pulled off as soon as possible."  *Id.* Roberts ran over Williams "trying to get away."  *Id.*  Wilkie asked Roberts if the Mercury had mechanical problems, and he responded no.  *Id.*

Williams died after spending a couple of hours at the hospital following the incident.  *Id.* Dr. Karen Chancellor, an expert in forensic pathology, performed Williams' autopsy and determined that he died of multiple blunt force injuries.  *Id.*  Williams had several skull fractures; bleeding and swelling of the brain; numerous contusions, lacerations, and abrasions; several broken ribs; a broken breastbone; and a broken left tibia.  *Id.*  Chancellor determined that the head injury was fatal.  *Id.*  Williams had marijuana in his system.  *Id.*

The defense called Kent to testify about his response to the incident.  *Id.*  Kent said he spoke with Slagle about 11:40 p.m. and was "jotting stuff" on his notepad as she spoke.  *Id.* Kent wrote a supplement to his notes later in his office.  *Id.*  Kent said Slagle told him that she

6

heard something outside, and when she looked out, "she saw a car speeding down the road and at some point[,] she saw a man out there I guess with his hand up in front of the car and this car ran over this man." *Id.* Kent acknowledged that Slagle said the man was running alongside the moving car and ran in front of the car. *Id.* On cross-examination, Kent testified that Williams "tried to stop a light colored sedan who was speeding down the street." *Id.* Kent testified that Slagle did not say that Williams had a gun. *Id.*

After Kent's testimony, the trial court asked if there were other witnesses Roberts wanted to call, and Roberts responded that he thought Slagle was coming back to testify. *Id.* at *5. The court responded, "I believe we got the statement in through the officer. We got it before the jury." *Id.*

MPD Officer David Wagner testified on rebuttal for the State. *Id.* Wagner responded to the scene, spoke with Slagle, and typed her statement into a "PDA." *Id.* Wagner wrote his report from the "PDA" within an hour. *Id.* Wagner said that Slagle saw Williams running alongside the passenger side of the white car and "step in front of the white car with his arms outstretched in what appeared to be an attempt to get the car to stop." *Id.* Slagle said the white car then accelerated forward and struck Williams, who was knocked back several feet and fell to the ground. *Id.* Slagle said the car continued accelerating, and Williams was run over. *Id.* According to Wagner, Slagle said she first saw the car move "once the victim had stopped and put his hands outstretched [in] what appeared to her to be an attempt to stop the car." *Id.*

MPD Sergeant Kevin Craig testified on rebuttal about the statement that he took from Slagle. *Id.* According to the formal, three-page, typed statement, Slagle saw "a white car with a Caucasian male . . . running beside the passenger side of the vehicle." *Id.* The man ran in front of the vehicle waving his hands to stop. *Id.* Slagle said he "then planted himself in front

7

of the car with his hands in the air." *Id.* The driver "slammed on the accelerator and hit the male directly," and the man "then flew back a few feet and landed on his back . . . and the vehicle then ran over him and fled the scene." *Id.* Craig said that Slagle did not say anything about the car moving before the victim planted himself in front of the car. *Id.*

  C.  **The Post-Conviction Hearing**

McClusky, Roberts' lead trial counsel, testified that the defense had "quite a bit" of discovery and that he either hand-delivered it or mailed it to Roberts. *Roberts*, 2021 WL 5495828, *6. (*See* ECF No. 17-15 at PageID 1180–81.) McClusky met with Roberts several times while Roberts was in jail awaiting trial and was sure they reviewed the discovery. *Id.* McClusky reviewed the discovery himself at least once before trial and prepared a trial notebook. *Id.*

He did not remember if the State made a plea offer, but he testified that he would have communicated any offer to Roberts. *Id.* McClusky noted that Williams' father was a former MPD officer and was "pretty upset," and McClusky did not think the father would be satisfied with a plea. *Id.*

Because Roberts claimed the victim jumped in front of the moving vehicle, the defense's theory was that Roberts was trying to leave when the victim came out of the house and that Roberts could not see the victim in front of the vehicle because Roberts had ducked down. *Id.* McClusky described the incident as "heated" and said that there was provocation because the victim was approaching the vehicle and the victim's father had a gun. *Id.* McClusky testified that he would have "definitely" discussed voluntary manslaughter with Roberts. *Id.*

8

The defense hired a private investigator. *Id.* However, Williams' father refused to speak with the investigator, and the defense did not speak with any of the police officers before trial. *Id.* The defense reviewed the police reports. *Id.*

McClusky thought he spoke with Slagle before trial and the "details" of her statements were in discovery. *Id.* McClusky said that, although he saw Kent's supplement in the discovery materials, he did not notice that it said the victim ran in front of a speeding car. *Id.* McClusky put Kent on as a witness "instead of recalling [Slagle], due to some scheduling." *Id.* McClusky did not think it was necessary to bring Slagle back after Kent testified. *Id.* McClusky advised Roberts to pursue direct appeal, but Roberts "wanted to go straight for post-conviction." *Id.* at *7.

On cross-examination, McClusky testified that there was some indication that the State might re-indict Roberts for first-degree murder and that the State would not negotiate for less than second-degree murder. *Id.* McClusky acknowledged that a weapon was not recovered from the victim. *Id.* Further, McClusky said that Slagle was a "very good witness" and that she probably did not need "coaching." *Id.* McClusky said that, if Slagle had been called back to testify, she would have been able to explain the inconsistent statement she made to Kent. *Id.*

Roberts called Slagle as a witness at the post-conviction hearing. *Id.* She said that she would have told them that the white car was "stationary in the middle of the street," and the victim ran in front of the car with his hands in the air. *Id.* She said "then that car proceeded to go from what I perceived as stationary, to full speed and ran over the individual, and fled the scene." *Id.* After reviewing Kent's supplement, Slagle said that Kent's description of the events was not true and that the car was stationary, and was "never, never moving." *Id.*

Kent testified that he wrote the supplement from his notes, that it was not a formal statement, and that he would not have written something that the witness did not tell him. *Id.* On cross-examination, Kent acknowledged that he did not write down "verbatim" what Slagle said; that the supplement did not have all the details about the incident; and that the supplement did not specify whether the car was moving or stationary when the victim moved in front of it. *Id.* at *8.

Roberts testified that his family retained counsel for him, that his counsel met with him "maybe five times" in jail, that counsel provided discovery, that Roberts reviewed the discovery, and that Roberts pointed out to counsel what his defense would be at trial. *Id.* Roberts said there was a plea offer for twenty years and an offer for thirteen and one-half years and that he and his counsel talked about his defense and the offers.[2] *Id.* Roberts' co-counsel said he would fight for a lesser-included offense at trial and that he would show the jury that the victim's father had a gun. *Id.* Defense counsel did not cross-examine Slagle on her inconsistent statements, and Roberts "had to point it out" at trial. *Id.* Still, defense counsel did not call Slagle back to testify, despite the trial court granting permission to recall her because they were "trying to save time." *Id.* Roberts acknowledged that he turned down a twenty-year offer, but he said that, if he had known his counsel was not going to cross-examine witnesses, he "may would have pled guilty." *Id.*

Roberts testified that Slagle gave two statements on the scene to two different officers and that her third statement, made at the police department two to three hours later, was inconsistent with her prior statements at the scene. *Id.*

---

[2] The district attorney general affirmed that a twenty-year plea deal was offered to Roberts. *Id.*

10

## II. ROBERTS' § 2254 PETITION

On July 21, 2022, Roberts filed his § 2254 Petition, alleging the following grounds for relief:

1. He received ineffective assistance of counsel (ECF No. 1 at PageID 4–5); and

2. The Warden is depriving Roberts of freedom from bodily restraint and punishment without the procedural safeguards secured by the Sixth and Fourteenth Amendments to the United States Constitution (*id.* at PageID 6–7).

## III. ANALYSIS

### A. Ineffective Assistance of Counsel

In Claim 1, Roberts alleges ineffective assistance of trial counsel for failure to review discovery before trial, interview Slagle, and subpoena Slagle for further questioning at trial. (ECF No. 1 at PageID 4.)   Roberts contends that, on the second day of trial, his trial counsel admitted it was the first time he reviewed the discovery documents. (*Id.*)   Roberts asserts that the discovery documents included police statements with Slagle's conflicting statements about whether Roberts' car was speeding down the street or stationary when Slagle first saw it. (*Id.*)   He argues that, because his trial counsel did not review discovery, he failed to interview Slagle before trial and to cross-examine her about the conflicting statements. (*Id.*)   Even after the trial court allowed the defense to call Slagle as a defense witness, Robert's counsel refused to call her for cross-examination about the inconsistent statements, and the jury never had the opportunity to hear, in Slagle's own words, why the statements were inconsistent. (*Id.* at PageID 5.)

Respondent argues that Roberts is not entitled to relief on his ineffective assistance claims because they are procedurally defaulted and/or without merit. (ECF No. 18 at PageID 1410–16.)   First, Respondent argues that Roberts did not properly exhaust the claim that counsel failed to review discovery because, although it was raised in the post-conviction trial court,

11

Roberts failed to raise it before the TCCA on post-conviction appeal, and Roberts has not argued cause and prejudice to overcome the procedural default.  (ECF No. 18 at PageID 1411–12.) Second, Respondent contends that the claim that counsel should have interviewed Slagle was not exhausted and is procedurally defaulted.  (*Id.* at PageID 1412–13.)  Respondent also analyzes this claim as it was raised in his post-conviction appeal, and argues that it is without merit because Roberts was not prejudiced.  (*Id.* at PageID 1413.)  Third, Respondent asserts that, although Roberts did exhaust his claim about failure to recall Slagle to testify as a defense witness, that claim lacks merit.  (*Id.* at PageID 1414–15.)

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "requires habeas petitioners to exhaust their claims in state court before turning to a federal court for relief," and "a state court's resolution of a claim on the merits receives deference in federal habeas proceedings."  *Chandler v. Brown*, 126 F.4th 1178, 1188 (6th Cir. 2025); *see* 28 U.S.C. §§ 2254(b)(1)(A), (c), and (d)(1)–(2).  "Ordinarily, a state prisoner satisfies this exhaustion requirement by raising his federal claim before the state courts in accordance with state procedures."  *Shinn v. Ramirez*, 596 U.S. 366, 378 (2022).  The prisoner must present to the state courts "the same claim under the same theory," argue the claim's factual and legal basis at each level of the state court system, and make the state court aware of the "federal nature of the claim."  *Davis v. Jenkins*, 115 F.4th 545, 554 (6th Cir. 2024).  If a claim has never been presented to the state court but a state-court remedy is no longer available (such as when an applicable statute of limitations bars a claim), the claim is technically exhausted, but procedurally barred.  *Coleman v. Thompson*, 501 U.S. 722, 731–32 (1991).  To avoid procedural default, a habeas petitioner in Tennessee must present his federal claims to the trial court and, on appeal, to the TCCA.  *Covington v. Mills*, 110 F. App'x 663, 665 (6th Cir. 2004).

12

A prisoner may overcome procedural default by showing cause and prejudice or factual innocence. *Dretke v. Haley*, 541 U.S. 386, 388 (2004); *Davila v. Davis*, 582 U.S. 521, 527–28 (2017) (describing procedural default as a corollary to the exhaustion requirement).

      1. <u>Failure to Review Discovery & Interview Slagle</u>

Respondent contends that Roberts' claims of counsel's failure to review discovery and failure to interview Slagle before trial are unexhausted and procedurally defaulted. (ECF No. 18 at PageID 1411–13.) On post-conviction appeal, Roberts asserted that trial counsel was ineffective for "not noticing" that Slagle gave inconsistent statements and for failing "to call Slagle back to testify." *Roberts*, 2021 WL 5495828, at *9. (*See* ECF No. 17-18 at PageID 1300.) Although related to Roberts' post-conviction ineffective assistance claims, Roberts's habeas claims about discovery and interviewing Slagle before trial do not assert the same facts and same theory as in the post-conviction proceedings, were not fairly presented before the TCCA, and were not exhausted. Roberts does not argue cause and prejudice or actual innocence to overcome the procedural default. *See Schlup v. Delo*, 513 U.S. 298, 320–21 (1995); *see Coleman*, 501 U.S. at 750. Roberts' ineffective assistance claims about failure to review discovery and to interview Slagle are procedurally defaulted and **DENIED**.

      2. <u>Failure to Recall Slagle</u>

Roberts' ineffective assistance claim related to counsel's failure to recall Slagle to testify was exhausted on post-conviction appeal. *See Roberts*, 2021 WL 5495828, at *9. The TCCA cited the relevant case law in *Strickland v. Washington*, 466 U.S. 668 (1984), which provides that a convicted defendant alleging ineffective assistance of counsel must demonstrate that "counsel's performance was deficient" and that "the deficient performance prejudiced the defense." 466 U.S. at 687. "[B]ecause a petitioner must establish both prongs of the test, a failure to prove

13

either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Roberts*, 2021 WL 5495828, at *10 (quoting *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). The TCCA agreed with the State and the post-conviction court that Roberts had not demonstrated deficiency or prejudice. *Roberts*, 2021 WL 5495828, at *9–10.

Where, as here, a state prisoner's claim has been adjudicated on the merits in state court, a federal court can issue a writ only if the adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d)(1)-(2). The petitioner carries the burden of proof for this "difficult to meet" and "highly deferential standard[.]" *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotation marks and citations omitted).

A state court's decision is "contrary" to federal law when it "arrives at a conclusion opposite to that reached" by the Supreme Court on a question of law or "decides a case differently than" the Supreme Court has "on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). "[A] run-of-the-mill state-court decision applying the correct legal rule . . . to the facts of a prisoner's case" does not "fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Id*. at 406.

An "unreasonable application" of federal law occurs when the state court "identifies the correct governing legal principle from" the Supreme Court's decisions "but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. This application of federal law must be "objectively unreasonable" for the writ to issue. *Id*. at 409. It is not sufficient that the habeas court, in its independent judgment, determines that the state court decision applied clearly

14

established federal law erroneously or incorrectly. *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citing *Williams*, 529 U.S. at 411). Indeed, as a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement. *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

Regarding his ineffective assistance claim, Roberts has failed to demonstrate that the TCCA's decision was contrary to or unreasonably applied established Federal law or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

To establish deficient performance, the first prong of *Strickland*, a defendant "must show that counsel's representation fell below an objective standard of reasonableness." *Id*. at 688. A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range of reasonable professional assistance." *Id*. at 689. The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687. "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Richter*, 562 U.S. at 105 (quoting *Strickland*, 466 U.S. at 690).

To demonstrate prejudice, a prisoner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. "It is not enough to show that the errors had some conceivable

15

effect on the outcome of the proceeding. Counsel's errors must be so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Richter*, 562 U.S. at 104 (internal quotation marks and citation omitted); *see also id*. at 111–12 ("In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. . . . The likelihood of a different result must be substantial, not just conceivable.") (internal citations omitted); *Wong v. Belmontes*, 558 U.S. 15, 27 (2009) (per curiam) ("But *Strickland* does not require the State to 'rule out' [a more favorable outcome] to prevail. Rather, *Strickland* places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different.").

       The deference to be given a state-court decision under *Strickland* is magnified when reviewing a claim of ineffective assistance of trial counsel under 28 U.S.C. § 2254(d). Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential." *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997). When the two standards apply in tandem, review is "doubly" deferential. *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (internal citation omitted). The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S. at 123. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105 (parallel citations omitted).

Roberts argues that, without consulting him, his trial counsel, refused to recall Slagle for cross-examination on the inconsistent statements made before trial and that the jury never heard, in Slagle's own words, why she gave conflicting statements.  (ECF No. 1 at PageID 5.) Respondent argues that Roberts did not show deficient performance and prejudice; that the TCCA's opinion was "run-of-the-mill" and not contrary to established Supreme Court precedent; and that the TCCA's opinion was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement" under the unreasonable application clause of § 2254(d)(1).  (ECF No. 18 at PageID 1414–15.)  Respondent asserts that the record supports the TCCA's reasoning because the defense's strategic decision resulted in Slagle's contradictory statements coming into evidence without her having the opportunity to deny the statement or contend that Kent got it wrong.  (*Id.* at PageID 1415.)  According to Respondent, the jury heard Slagle's statements through Kent's testimony; the TCCA's factual determination is presumed to be correct under 28 U.S.C. §§ 2254(d)(2) and (e)(1); and Roberts has not rebutted the presumption about this factual determination by showing clear and convincing evidence to the contrary.  (*Id.*)

Roberts does not argue his habeas claims within the context of the AEDPA and does not contend that the TCCA's decision was contrary to or an unreasonable application of *Strickland* or that it was based on an unreasonable determination of facts in light of the evidence presented in state court.  However, even if he did so argue, the TCCA cited and applied *Strickland* in its analysis.  *See Roberts*, 2021 WL 5495828, at *9–10.  The TCCA addressed counsel's decision to call Kent to testify instead of Slagle and the benefit to the defense of not giving Slagle the opportunity to explain her conflicting statements, as well as counsel's closing argument that Slagle's statement to Kent was correct and closer in time to the incident.  *Id.* at *10.  The

17

TCCA considered counsel's approach to be a strategic choice that should not be second-guessed in hindsight.  *Id.*  The TCCA cited state case law consistent with *Strickland* and its progeny that applies a strong presumption of reasonableness to counsel's strategic decisions.  *Id.* (citing *Irick v. State*, 973 S.W.2d 643, 652 (Tenn. Crim. App. (1998)), and *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982)); *see Strickland*, 466 U.S. at 689 ("the defendant must overcome the presumption that, . . . the underchallenged action 'might be considered sound trial strategy'").  The TCCA decided that "[t]rial counsel were able to correct their mistake . . . by getting the information to the jury through Sergeant Kent's testimony."  *Roberts*, 2021 WL 5495828, at *6.  The TCCA focused on Slagle's and Kent's testimony at the post-conviction evidentiary hearing and noted that "post-conviction counsel confronted Dr. Slagle with Sergeant Kent's statement as the Petitioner had wanted trial counsel to do at trial."  *Id.* at *10.  The TCCA concluded that Slagle "reiterated that Petitioner's car did not move until the victim stood in front of the car, that Sergeant Kent's supplement was incorrect, and that [Slagle] would have said so if asked about the supplement at trial."  *Id*.  The TCCA opined that "even if trial counsel were deficient for not noticing Dr. Slagle's inconsistent statements in the discovery materials, we agree with the post-conviction court that the Petitioner has failed to demonstrate prejudice."  *Id.*

The TCCA's decision was not contrary to or an unreasonable application of *Strickland* and is based on a reasonable determination of facts in light of the evidence presented.  Roberts' claim that his trial counsel was ineffective for failure to recall Slagle is without merit and is therefore **DENIED**.

        **B.**     **Freedom From Bodily Restraint & Punishment**

Roberts asserts that the Warden is depriving Roberts of the "Freedom Bodily Restraint and Punishment" without the procedural safeguards of the Sixth and Fourteenth Amendments to

18

the United States Constitution through his enforcement of Tennessee Code Annotated § 41-1-101, *et seq.*, the state statutes for correctional institutions and inmates. (ECF No. 1 at PageID 6.) Roberts then alleges the same facts used to support his ineffective assistance of trial counsel claim. (*Id.*) Roberts admits that he did not exhaust state remedies for this purported grounds for relief. (*Id.* at PageID 6–7.)

Respondent contends that the claim is procedurally defaulted and not cognizable. (ECF No. 18 at PageID 1416–17.) Respondent argues that Roberts did not exhaust his claim and that ineffective assistance of post-conviction counsel cannot establish cause for the procedural default. (*Id.* at PageID 1416.) Respondent asserts that Roberts' attempt to connect the Tennessee statute about imprisonment to the Sixth and Fourteenth Amendments is not a sufficient connection to present a cognizable constitutional claim. (*Id.* at PageID 1417.)

The Court construes Roberts' assertion that he should be free from bodily restraint and punishment as a request for relief based on the alleged ineffective assistance of counsel (Sixth Amendment violations) instead of an independent constitutional claim. As stated *supra*, the Court has determined that Roberts is not entitled to relief on his Sixth Amendment claim and therefore not entitled to relief for his claim to freedom from bodily restraint and punishment.

IV.     **CONCLUSION**

Because every claim asserted by Roberts is procedurally defaulted and/or without merit, the Court **DENIES** the § 2254 Petition. The § 2254 Petition is **DISMISSED WITH PREJUDICE**. Judgment shall be entered for Respondent.

V.      **APPEAL ISSUES**

No § 2254 petitioner may appeal without a certificate of appealability ("COA"). 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). To obtain a COA, a petitioner must make "a

19

substantial showing of the denial of a constitutional right." *See* 28 U.S.C. § 2253(c)(2); *Dennis v. Burgess*, 131 F.4th 537, 539 (6th Cir. 2025). A petitioner must demonstrate "that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). If the district court denies relief on a procedural ground without reaching the underlying constitutional claim, a COA should issue when the petitioner demonstrates "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Because jurists of reason would not debate the district court's resolution of Petitioner's claims, the Court **DENIES** a COA.

A party seeking pauper status on appeal must first file a motion in the district court, along with a supporting affidavit. Fed. R. App. P. 24(a)(1). If the district court certifies that an appeal would not be taken in good faith or otherwise denies leave to appeal *in forma pauperis*, the prisoner must file his motion to proceed *in forma pauperis* in the appellate court. *See* Fed. R. App. P. 24(a)(4)–(5). For the same reasons the Court denies a COA, the Court **CERTIFIES** that any appeal would not be taken in good faith. Leave to appeal *in forma pauperis* is **DENIED**.[3]

**IT IS SO ORDERED**, this 20th day of May, 2025.

> s/ Sheryl H. Lipman
> SHERYL H. LIPMAN
> CHIEF UNITED STATES DISTRICT JUDGE

---

[3] If Roberts files a notice of appeal, he must pay the full $605 appellate filing fee or file a motion to proceed *in forma pauperis* and supporting affidavit in the Sixth Circuit Court of Appeals within 30 days of the date of entry of this order. *See* Fed. R. App. P. 24(a)(5).